Regina LIPSCOMB, Commissioner, West Virginia Department of Human Services, in her official capacity, Plaintiff,

v.

Otis BOWEN, Secretary of the United States Department of Health and Human Services; and William L. Roper, M.D., Administrator of the U.S. Health Care Finance Administration; and Maurice Hartman, Acting Regional Administrator for U.S. Health Care Finance Administration, Defendants.

Civ. A. No. 2:87–0333.

United States District Court, S.D. West Virginia, Charleston Division.

June 28, 1989.

Phyllis H. Carter, Asst. Atty. Gen., Charleston, W.Va., Kurt E. Entsminger, Asst. U.S. Atty., James C. Newman, Dept. of Health & Human Services/OCC Region III, Philadelphia, Pa., for defendants.

Michael H. Cook, Wood, Lucksinger & Epstein, Phyllis D. Thompson, Washington, D.C., for West Virginia Health Care Ass'n, amicus curiae.

## MEMORANDUM OPINION

DENNIS R. KNAPP, District Judge.

The Court has before it motions for summary judgment filed by each of the parties to the above-styled proceeding. Essentially there is presented by said motions a single issue, the resolution of which is dispositive of this case which has been pending since April 2, 1987. On that date this Court enjoined unilateral action by the United States Department of Health and Human Services that reduced matching federal funds for the Medicaid program administered by the State of West Virginia (the State) under the provisions of 42 U.S.C. § 1396b(d)(1) and the regulations promulgated thereunder. The pertinent facts giving rise to the litigation and the statutory regulations applicable are set out in the Memorandum Opinion of this Court rendered at the time upon which the aforesaid injunction was implemented. Reference is made to said Memorandum Opinion appearing in the official case file. For further history of the facts, reference is made also to the Grant Appeals Board (GAB) decisions, the first of which is designated "Draft Decision" and issued on December 4, 1987, and the Final Decision (Decision No. 956) issued on May 19, 1988.

At this point a brief recitation of the facts that are pertinent and lead to a better understanding of the issue before this

Court arising out of the present motions would seem in order. The action of Health Care Finance Administration (HCFA) in disallowing funds allegedly due the State in the administration of the Medicaid program by the West Virginia Department of Human Services was appealed by the State to the GAB. A draft decision issued on December 4, 1987, held that the disallowances were improper and in so doing held that the hospital met the requirements of 42 C.F.R. § 433.45. On May 19, 1988, the Board issued a new and final decision reversing its former conclusions, reciting as a basis therefor only that the disallowances by HCFA were proper in light of the common meaning of "donation." The term "donation," as it is relevant to the issue raised herein, should not be utilized as an exercise in semantics. It has a meaning which has been established by the GAB in other proceedings and by the Regulation in question.

The proceedings before the administrative agency (the GAB) which ultimately upheld the disallowances are subject to review by the Court. Pursuant to the Administrative Procedures Act, 5 U.S.C. § 706, the ultimate standard of review is a limited one. An agency's interpretation of its regulations should be accepted by the courts unless it is shown to be unreasonable or inconsistent with statutory authority or to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In reviewing the action of the HCFA in the instant case, a fair and reasoned interpretation of the provisions of the pertinent statute is required. It is as follows:

(a) Public funds as the State's share.

(1) Public funds may be considered as the State's share in claiming FFP [federal financial participation] if they meet the conditions specified in paragraphs (a)(2) and (3) of this section.

(2) The public funds are appropriated directly to the State or local Medicaid agency, or transferred from other public agencies (including Indian tribes) to the State or local agency and under its ad-ministrative control, or certified by the contributing public agency as representing expenditures eligible for FFP under this section.

(3) The public funds are not Federal funds, or are Federal funds authorized by Federal law to be used to match other Federal funds.

(b) Private donated funds as the State's share.

(1) Funds donated from private sources may be considered as the State's share in claiming FFP only if they meet the conditions specified in paragraphs (b)(2) and (3) of this section.

(2) The private funds are transferred to the State or local Medicaid agency and are under its administrative control.

(3) The private funds do not revert to the donor's facility or use unless the donor is a nonprofit organization, and the Medicaid agency, of its own volition, decides to use the donor's facility.

42 C.F.R. § 433.45.

In order to determine whether a state may use private funds as its Medicaid share, the pertinent regulatory language must be examined in the light of reason and fairness and without resort to the rhetoric that would thwart that very concept. The only Medicaid regulation basic to the issue here presented and clearly decisive of same is 42 C.F.R. § 433.45. This regulation allows states to use private donated funds as their share of funds for Medicaid if they meet two requirements:

1. [t]he private funds are transferred to the State or local Medicaid agency and are under its administrative control; and

2. [t]he private funds do not revert to the donor's facility or use unless the donor is a nonprofit organization, and the Medicaid agency, of its own volition, decides to use the donor facility.

42 C.F.R. § 433.45(b)(2) and (3).

The Board in its initial hearing and in its findings based thereon found that these two requirements were met. Thereafter in reversing its earlier conclusions, which comported with the law and was clearly right, the Board for some unexplained reason alleged that the hospital contributions

could not constitute the State's share, since the funds had not been "donated under the commonly accepted meaning of the term." Decision No. 956, at p. 9. By applying what it termed the common meaning of "donation," i.e., a voluntary gift without conditions, as a requirement, the Board essentially added new requirements to the regulation. These requirements so artfully crafted by the Board, however, had actually been contemplated by the drafters of the original regulations and rejected.

It is true that prior to November 12, 1985, section 433.45 required that privately donated funds be made without restrictions, as pointed out in the *Draft Decision*, at p. 10. At the time when § 433.45, as it stands today, was being drafted, such restrictions were considered; however, they were specifically rejected. *Id.* (citing 49 Fed.Reg. 23078, June 4, 1989). The present regulation does not contain any such restrictions. The Board in its Draft Decision relied upon such deletion when it rejected the Agency's argument that restrictive donations were not authorized. Thus, it is perplexing to this Court that the Board in its draft decision relied upon such restrictions to find that the funds do not qualify as the State's share.

The restrictions the Board relies upon in its final decision focus on the "coercive" nature of the State's dealings. The alleged coercive behavior of the State is based upon the following factors:

    1.  preferential treatment to the participating hospitals; and

    2.  an increase in the interim reimbursement rate to 95% for participating hospitals without considering individual cost histories of the hospitals.

With respect to the first factor, the State admitted that they sought and used the funds to pay backlogged Medicaid claims of the hospitals. At the time of the Draft Decision, the Board took notice that some hospitals may have been paid more expeditiously than other noncontributing hospitals. *Draft Decision*, at p. 9. The Board accurately noted "that the noncontributing hospitals were [not] delayed in receiving payment any more than they might have

been if no donations had been made at all. Nor is there evidence of complaints of discrimination or of lawsuits by the noncontributing hospitals." *Id.*

During the evidentiary hearing held between the Draft Decision and Decision No. 956, (special hearing) no evidence was introduced which would refute the Board's findings in its Draft Decision. There was, however, evidence introduced at the special hearing by a hospital official that he did not feel intimidated or coerced into participating. *Decision No. 956*, p. 12. This evidence was dismissed by the Board by noting that "[t]he primary point, however, is that the preferential treatment served as an inducement for the other hospitals to participate in the State's program and that the non-participating hospitals were left with no guarantee or assurance as to when their pending claims would be paid." *Id.*, at p. 15, fn. 13.

An inducement is not prohibited by § 433.45. The fact that the noncontributing hospitals were left with no guarantee or assurance is without merit. The State was in such financial straits that no hospital had a guarantee or assurance that they would be paid. In the end the noncontributing hospitals were in a better position than the contributing hospitals because they received payment of all of their claims without having had to contribute. The Board recognized this fact in its Draft Decision and even found the increased rate of 95% had been authorized by the State's plan. *Draft Decision*, at p. 9. The Board's reliance on such increase as resulting from coercive behavior is, therefore, illfounded.

The Board's statements and findings in its final decision are not only irreconcilable with its Draft Decision, but they are inconsistent with its prior decisions involving the same or similar questions. The Agency's definition of "donation" has been addressed and rejected in cases raising the issue here presented or issues similar thereto. See, *Connecticut Department of Human Resources*, GAB Decision No. 406 (April 28, 1982), and Texas Dept. of Human Services, amended GAB Decision 381 (June

30, 1986). Therefore, in the instant case, the Board's use of the Agency's rejected definition of donation is a complete misstatement of the applicable law.

The Agency also cites *Tennessee Dept. of Health and Environment*, DAB No. 1047 (May 4, 1989), as support for the Board's position in this case. The *Tennessee* decision came after the instant case. The Board in *Tennessee* attempts to lend credence to its decision in the instant case, but again falls short of the plain reading of § 433.45. The fact remains that the Board cannot substitute an inconsistent reading of its regulation to justify an absurd result whatever be its motivation.

The Board attempts to reconcile its conclusions in its final decision with its draft decision as follows:

> "The draft decision, as did the parties in their initial briefing, focused on whether the funds came under the 'administrative control' of the State ..., and whether the funds ... met the requirements of section 433.45(a)(sic)(3). The Agency in its comments on the draft decision argued the State failed to meet the threshold criterion of Section 433.45 that the funds must be 'donated.' "

Decision No. 956, at p. 2.

These statements imply that the Board did not examine the threshold issue as to whether the funds were "donated." Nothing could be further from the truth. The Board, on the contrary, noted in the Draft Decision that "[i]ndeed, HCFA contended that the contributions were not "donations" within the generally accepted meaning of the term. *Draft Decision*, at p. 7. The Board in its final decision attempts to justify a result urged by the Department of Human Services that defies reason, and in so doing resorts to a misstatement of the applicable provisions of law and a belated and reckless interpretation of the facts. Such action renders the decision unlawful and clearly arbitrary and capricious.

It is clear that § 433.45 does not require unconditional donations. The Board cannot arbitrarily add new requirements to a regulation, especially when such requirements were considered by the drafters of the reg-ulation and specifically rejected. See, e.g., *Gardebring v. Jenkins*, 485 U.S. 415, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988) (Court should reject a board's narrow reading when an "alternate reading is compelled by the Secretary's intent at the time of the regulation's promulgation"); *Community for Creative Non–Violence v. Watt*, 670 F.2d 1213, 1216 (D.C.Cir.1982). ("[C]ourt may rely upon the Agency's contemporaneously issued Policy Statement as an accurate representation of the Agency's intent.") This Court, although having jurisdiction only to review the agency decisions, does not hesitate to rescind the Board's action as arbitrary and capricious and not in accordance with law.

Accordingly, the final action of the Board is adjudged to be invalid and of no effect. The Court finds that the Board's Draft Decision is correct and is binding on the Agency and judgment is rendered for the plaintiff.